IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Chief Judge Marcia S. Krieger

Civil Action No. 14-cv-01527-MSK-KMT

DYNARESOURCE DE MEXICO, S.A. de C.V.; and
DYNARESOURCE, INC.;

      Plaintiffs,

v.

GOLDGROUP RESOURCES, INC.,

      Defendant.

_____

**OPINION AND ORDER DENYING MOTION TO DISMISS AND DENYING MOTION FOR SUMMARY JUDGMENT**
_____

**THIS MATTER** comes before the Court pursuant to the Plaintiffs DynaResource De Mexico ("Dyna Mexico") and DynaResource, Inc.'s ("Dyna USA") Objections **(# 36)** to the Magistrate Judge's August 27, 2015 Recommendation **(# 36)** that the Defendant's ("Goldgroup") Motion to Dismiss **(# 23)** be granted; and the Plaintiffs' Motion for Summary Judgment **(# 29)**, Goldgroup's response **(# 31)**, and the Plaintiffs' reply **(# 32)**.

## FACTS

According to the Amended Complaint **(# 19)**, Dyna Mexico is engaged in gold mining operations in Mexico.  In September 2006, Dyna Mexico and Goldgroup entered into an Option Agreement that permitted Goldgroup to obtain up to a 50% equity stake in Dyna Mexico in exchange for making periodic capital contributions to the business.  Goldgroup exercised that option in 2011, obtaining its 50% equity, and availed itself of the opportunity to appoint two of

the four members of Dyna Mexico's Board of Directors (those four board members then jointly appoint a fifth).

Goldgroup complained that Dyna Mexico's President has, since April 2012, circumvented the Board of Directors and proceeded to conduct Dyna Mexico's operations without the input of Goldgroup or its appointed Directors.  Most significantly, in May 2013, Dyna Mexico purportedly convened a "shareholder's meeting" without informing Goldgroup or their affiliated Directors, at which Dyna Mexico voted to issue additional shares of its stock to a related entity, Dyna USA, ostensibly in exchange for Dyna USA forgiving certain loans it had made to Dyna Mexico.  The effect of the issuance of additional stock diluted Goldgroup's equity stake from 50% to 20%.

In March 2014, Goldgroup filed a Demand for Arbitration with the American Arbitration Association, naming both Dyna Mexico and Dyna USA as defendants and asserting various claims sounding in breach of contract and breach of fiduciary duty, among others.  Goldgroup chose arbitration as the tribunal pursuant to terms in the 2006 Option Agreement, and that agreement's Article 8.16 that states that "[a]ll questions or matters in dispute under this Agreement shall be submitted . . . to binding arbitration." Under the terms of that Agreement, such arbitrations are required to be conducted in Denver, Colorado.

On May 30, 2014, the Plaintiffs commenced the instant suit in this Court.  Reciting the above facts, more or less, they argue that the Option Agreement expired upon the parties' complete compliance with its terms in 2011 – upon Goldgroup making the final scheduled capital contribution and receiving its 50% stake in Dyna Mexico -- and thus, that the agreement

and its arbitration clause are no longer operative.[1]  The Plaintiffs also allege that, on their face, Goldgroup's claims arise out of "an apparent power struggle among shareholders," not out of any provisions of the Option Agreement.   The Plaintiffs contend that these disputes are amenable to resolution in one or more of eight lawsuits currently pending between these parties in Mexican courts and that Goldgroup has specifically deferred to these proceedings in the past.

The Plaintiffs assert four claims here, three of which seeks specific declaratory relief: (i) a declaration "that the Federal Court . . . in Mexico has Exclusive Jurisdiction over the *Res*" (the *res* being Golgroup's claims, apparently); (ii) a request for a stay of the Denver arbitration and an injunction against Goldgroup continuing to seek arbitration of the claims pending a decision by the Mexican courts; (iii) a declaration that Goldgroup's claims are not arbitrable because they do not arise under the Option Agreement; and (iv) a declaration that "by its Actions and Statements, Goldgroup has Waived, Forfeited, and is Estopped from Compelling Arbitration," which is essentially an argument for judicial estoppel.  The Plaintiffs invoke the Federal Arbitration Act ("FAA"), 9 U.S.C. § 2 *et seq.*, as the basis of such claims.

Goldgroup moved to dismiss **(# 23)** the claims for lack of subject matter jurisdiction, arguing: (i) there is no diversity of citizenship between the parties because there are foreign entities on both sides of the dispute, 28 U.S.C. § 1332(a)(2); and (ii) there is no basis for federal question jurisdiction because the FAA does not recognize claims seeking to halt or avoid an arbitration.  The Court referred this matter to the Magistrate Judge for a recommendation, and on August 27, 2015, the Magistrate Judge issued a Recommendation **(# 36)** that Goldgroup's motion be granted.  The Plaintiffs filed timely Objections **(# 37)** to that Recommendation.

---

[1]       Indeed, the Plaintiffs contend that, upon becoming a shareholder, Goldgroup became bound to Dyna Mexico's bylaws, which prohibit foreign shareholders from "invok[ing] the protection of his/her/its government," although it is not clear how this provision would apply to Goldgroup, a Canadian entity, seeking arbitration in the United States.

Separately, the Plaintiffs move for summary judgment (**# 29**) in their favor on all of their claims.

## ANALYSIS

### A.  Motion to dismiss

Because the Plaintiffs object to the Recommendation, the Court reviews the Motion to Dismiss *de novo*.  Fed. R. Civ. P. 72(b).

As the party invoking federal subject matter, the Plaintiffs bear the burden of demonstrating that such jurisdiction exists.  *Salzer v. SSM Health Care of Oklahoma, Inc.*, 762 F.3d 1130, 1134 (10th Cir. 2014).  Goldgroup's motion to dismiss under Fed. R. Civ. P. 12(b)(1) is a facial challenge to the Plaintiffs' contentions, and thus, the Court treats all of the allegations in the Amended Complaint as true.  *Pueblo of Jemez v. U.S.*, 790 F.3d 1143, 1146-47 & n. 4 (10th Cir. 2015).

The Plaintiffs do not appear to dispute that diversity jurisdiction is lacking pursuant to 28 U.S.C. § 1332(a)(2).  *But see Gschwind v. Cessna Aircraft Co.*, 232 .3d 1342, 1345 (10th Cir. 2000) (assuming, without deciding, that court lacked diversity jurisdiction over suit between foreign plaintiff and both domestic and foreign defendants).  Thus, the sole question before the Court is whether the Plaintiffs have validly invoked a claim arising under a federal statute pursuant to 28 U.S.C. § 1331.

As a preliminary matter, the Court observes that the Plaintiffs seek relief exclusively in the form of declarations.  The Declaratory Judgment Act, 28 U.S.C. § 2201(a), permits the Court to grant such relief in appropriate cases, but does not automatically confer federal question jurisdiction on the Court when invoked.  When, as here, a declaratory judgment action is commenced by the plaintiff in defense to an actual or anticipated action by the defendant, federal

question jurisdiction exists if the suit by the declaratory judgment defendant would arise under federal law. *Cardtoons, L.C. v. Major League Baseball Players Assn.*, 95 F.3d 959, 964 (10th Cir. 1996). The claims in Goldgroup's Demand for Arbitration do not invoke federal law, and thus, the Plaintiffs may not rely upon federal question jurisdiction arising under the Declaratory Judgment Act.

That leaves the Plaintiffs to rely on the FAA. As the Supreme Court pointed out, the FAA "is something of n anomaly in the field of federal-court jurisdiction. It creates a body of federal substantive law establishing and regulating the duty to honor an agreement to arbitrate, yet it does not create any independent federal-question jurisdiction under 28 U.S.C. § 1331." *Moses H Cone Mem. Hosp. v. Mercury Const. Corp.*, 460 U.S. 1, 25 n. 32 (1983); *1mage Software, Inc. v. Reynolds and Reynolds Co.*, 459 F.3d 1044, 1048 n. 6 (10th Cir. 2006). However, these cases are generally ones interpreting Chapter 1 of the FAA, a section that deals generally with requests by a party to compel a reluctant adversary to arbitrate. *See e.g.* 9 U.S.C. § 3 (allowing courts to stay litigation pending submission to arbitration); 9 U.S.C. § 4 (allowing petition to court to compel party to submit to arbitration).

The Plaintiffs argue that they are instead invoking a provision of Chapter 2 of the FAA, specifically 9 U.S.C. § 203, which states that "an action or proceeding falling under [The Convention on the Recognition and Enforcement of Foreign Arbitral Awards of June 10, 1958, often referred to as the "New York Convention"] shall be deemed to arise under the laws and treaties of the United States." In other words, a claim cognizable under the New York Convention is a claim over which federal question jurisdiction would lie. The New York Convention provides, among other things, that "the court of a Contracting State,[2] when seized of

---

[2]     The U.S., Mexico, and Canada are all signatories to the New York Convention.

an action in a matter in respect of which the parties have made an agreement [to arbitrate], shall, at the request of one of the parties, refer the parties to arbitration unless it finds that the said agreement is null and void, inoperative or incapable of being performed." 21 U.S.T. 2517, Art. II, § 3.   Generally, to invoke the New York Convention, a claim: (i) must involve a written agreement to arbitrate; (ii) must provide for arbitration in the territory of a signatory to the Convention; (iii) must involve subject matter that is commercial; and (iv) cannot be entirely domestic in scope. *Smith/Enron Cogeneration Ltd. Partnership, Inc. v. Smith Cogeneration Intern., Inc.*, 198 F.3d 88, 92 (2d Cir. 1999).   At least on their face, the Plaintiffs' claims meet all four requirements: they invoke the written Option Agreement and its arbitration clause, that clause calls for arbitration in the U.S. which is a signatory to the Convention, it ostensibly involves issues of title to security and management of a commercial enterprise and it is between entities from different nations.   Arguably, they invoke Art. II, § 3 of the New York Convention - the Plaintiffs seek a determination that the parties should <u>not</u> be referred to arbitration because the Option Agreement is "inoperative."

In response, Goldgroup cites to a line of cases in which courts have generally refused to treat actions seeking to <u>stay</u> a threatened arbitration as arising under the New York Convention in particular or the FAA generally.   The seminal case invoked by both Goldgroup and the Recommendation is *International Shipping Company, S.A. v. Hydra Offshore, Inc.*, 675 F.Supp. 146 (S.D.N.Y. 1987).[3]   There, in a fairly distinguishable factual context,[4] the court explained that

---

[3]      Both the parties and the Magistrate Judge recognized that the Second Circuit and, more specifically, the Southern District of New York, are the epicenter of disputes over matters involving international arbitration and thus, authority from those jurisdictions are particularly persuasive on these issues.

[4]      The plaintiff had contracted to purchase a ship from the defendant, but the defendant withdrew from the deal and attempted to sell the ship to a third party.   The plaintiff invoked

"actions covered by the Convention are those in which the party invoking the Convention seeks either . . . to compel arbitration or the enforcement of an arbitral award. . . . Because this case involved neither an action to compel arbitration nor enforcement of an arbitral award, the Court found that it did not have subject matter jurisdiction pursuant to the Convention." *Id.* at 153. The Second Circuit, in *dicta*, affirmed that conclusion, stating that the trial court "appropriately rejected" the plaintiff's attempt to invoke jurisdiction via the New York Convention. 875 F.2d 388, 391 n. 5.

The Recommendation also relies upon *Republic of Ecuador v. ChevronTexaco Corp.*, 376 F.Supp.2d 334, 349 (S.D.N.Y. 2005). The factual posture of that case defies easy summarization; it is sufficient to observe that the defendant and plaintiff entered into a contract containing an agreement to arbitrate. A dispute eventually arose and the defendant filed a Demand for Arbitration. The plaintiff commenced suit in state court seeking to halt the arbitration proceedings, and the defendant removed the action to federal court. The court *sua sponte* examined its own subject matter jurisdiction, finding that it "would have federal question jurisdiction over the subject matter of this action if the action were governed by [the New York Convention]." 376 F.Supp.2d at 347. It noted that "Plaintiffs do not request the Court to refer the parties to arbitration, but rather ask the Court to prevent arbitration," observing that "[i]t is

---

arbitration against the defendant in the U.K. and apparently secured a pre-hearing order enjoining the defendant from transferring the ship. 675 F.Supp. at 148. Then, somewhat redundantly, the plaintiff commenced suit in the U.S. seeking to enjoin the defendant and the other buyer from using, moving, or disposing of the ship, apparently pending the arbitration hearing. The U.S. court ultimately concluded that it lacked subject matter jurisdiction over the request and dismissed the plaintiff's claim. The defendant then sought Rule 11 sanctions against the plaintiff, and the court, finding that the plaintiff had not asserted any colorable basis for federal subject matter jurisdiction, agreed and granted sanctions against the plaintiff.

Unlike the situation presented here, in *Hydra*, the claim was one that sought to invoke provisional equitable relief in anticipation of the arbitration hearing, not a request seeking to halt the arbitration itself.

not at all clear that an action seeking such relief falls under the New York Convention." *Id.* at

348 (emphasis in original, internal quotes omitted).   Relying on the Second Circuit affirmance of

*Hydra*, the court also explained that "[t]here appears to be little or no basis in Second Circuit

case law for invocation of the New York Convention . . . by a party seeking to <u>avoid</u> arbitration,

rather than compel or aid it." *Id.* at 349.

      *Chevron* is problematic, however.   More recently, in *Goel v. Ramachandran*, 823

F.Supp.2d 206, 215 (S.D.N.Y. 2011), another judge in the Southern District of New York

suggested that the *Hydra/Chevron* line of cases are no longer persuasive.   *Goel* explains that

"the Second Circuit has subsequently taken a broader view of jurisdiction under the New York

Convention," *id.*, citing to a more recent ruling in the ongoing *Chevron* dispute, *Republic of

Ecuador v. Chevron Corp.*, 638 F.3d 384, 391 n. 6 (2d Cir. 2011).   In that later *Chevron* case,

Chevron had demanded arbitration against Ecuador based on a treaty providing for such, seeking

a declaration that Chevron was not responsible for certain environmental damage.   Several

individuals who were not parties to the requested arbitration commenced suit seeking to halt the

arbitration, claiming that it could contravene a judgment they had already obtained against

Chevron.   The trial court dismissed the suit on jurisdictional grounds and the plaintiffs appealed.

Although it affirmed the decision on other grounds, the Second Circuit, in passing, remarked that

"[g]iven the strong policy in favor of arbitration, and the lack of express authorization to stay

arbitrations under the New York Convention . . . Chevron asserts that courts lack the power to

stay [the] arbitration. <u>That is an open question in our Circuit</u>." *Id.* at 391 (emphasis added).   In

a footnote accompanying this discussion, the court elaborated:

        Although dicta in *International Shipping Co. v. Hydra Offshore,
        Inc.* suggests that the New York Convention is enforceable only
        where the party invoking its provisions seeks either to compel
        arbitration or to enforce an arbitral award, in light of the principle

> that the Convention should be interpreted broadly to effectuate its
> recognition and enforcement purposes, we conclude that the case
> law applying the New York Convention and the federal policy
> favoring arbitration apply where a court acts to protect its prior
> judgments by staying incompatible arbitral proceedings otherwise
> governed by the Convention.

638 F.3d at 391 n. 6 (citations and internal quotes omitted).   This, then, would seem to undercut

the suggestion in cases like *Hydra* and *ChevronTexaco* that claims seeking only to stay an

arbitration categorically fall outside the scope of the New York Convention.

Even more recently, *CRT Capital Group v. SLS Capital, S.A.*, 63 F.Supp.2d 367, 372-74

(S.D.N.Y  2014), appears to have completed the Southern District of New York's 180-degree

turn on this issue.[5]  There, the defendant argued that "the implementing legislation for the New

York Convention provides only three judicial remedies: compelling arbitration, appointing

arbitrators, and confirming arbitration awards.  Thus, according to SLS Capital, the Court lacks

jurisdiction to enjoin an arbitration proceeding." *Id.* at 372.  Ultimately rejecting this argument,

the court proceeded to trace the path set forth above, through *Hydra* and *ChevronTexaco* and

*Ramachandran* and *Chevron*, among others, and noted other cases in which the Second Circuit

had seemingly broadened the scope of federal jurisdiction under the New York Convention. *Id.*

at 373-74.  It concluded that all that was necessary for a federal court to have subject matter

jurisdiction over a claim arising under the New York Convention was that the claim invoked a

commercial dispute of international character with an agreement to arbitrate at issue – the same

elements from *Smith/Enron*, *supra*. *Id.* at 374.  In other words, *CRT Capital* seems to reject the

contention that federal courts' jurisdiction under the New York Convention rises or falls based

on the remedy being sought.  Instead, it indicates that federal courts have jurisdiction to hear

---

[5]      In fairness to the parties, the Court observes that *CRT Capital* was decided on December
5, 2014, after the parties had completed briefing on Goldgroup's Motion to Dismiss.

claims seeking any form of remedy (including stays of arbitration) so long as the claim involves an international commercial arbitration.  There is no ambiguity in the court's conclusion: "[t]he Court therefore may enjoin an arbitration proceeding governed by the New York Convention when the parties have not entered into a valid and binding arbitration agreement or where the claims are not within the scope of an arbitration agreement."  *Id* at 376.

Based on the foregoing, it is clear to this Court that the weight of authority has now repudiated *Hydra*'s narrow view of the scope of federal jurisdiction under the New York Convention and has embraced a more expansive view of federal jurisdiction under the Convention that includes claims seeking simply to stay an arbitration.  Accordingly, the Court agrees with the Plaintiffs that Goldgroup's Motion to Dismiss should be denied.

### B.  Motion for Summary Judgment

The Court then turns to the Plaintiffs' Motion for Summary Judgment.  That motion lays bare, in extensive detail, the long and contentious history of the parties' association and a host of arguments that the Plaintiffs have as to why arbitration should not proceed and why Goldgroup's underlying claims lack merit.   These issues are complex, and occasionally fascinating, and the Court has equal parts envy and sympathy for the arbitrator who will ultimately entertain them. But, for the reasons discussed below, the Court finds that it <u>is</u> appropriate for an arbitrator to entertain them.

For several decades, the Supreme Court has articulated a strong deference to parties' agreements to resolve disputes via arbitration.  In doing so, it has staked out easy to describe (but often difficult to implement) rules that define the roles of courts and arbitrators in determining whether a dispute is one that should be litigated or arbitrated.  As an initial matter, "the question of arbitrability – whether a [contract] creates a duty for the parties to arbitrate the particular

grievance – is undeniably an issue for judicial determination."[6] *AT &T Technologies, Inc. v. Communications Workers of America*, 475 U.S. 643, 649 (1986).  In making the determination of whether the parties have agreed to submit a particular grievance to arbitration, it is important that the Court limit itself to the question of whether the dispute, on its face, falls within the scope of the arbitration clause.  The Court must not consider the potential merits of the underlying claims; in other words, a "claim that [one party] has violated the [contract] is to be decided, not by the court asked to order arbitration, but as the parties have agreed, by the arbitrator." *Id.* at 649-50.  Moreover, courts are to indulge in a presumption of arbitrability, such that "an order to arbitrate the particular grievance should not be denied unless it may be said with positive assurance that the arbitration clause is no susceptible of an interpretation that covers the asserted dispute." *Id.* at 650 ("Doubts should be resolved in favor of coverage").

In short, then, the Court's role is limited to determining the threshold "question of arbitrability." *See Howsam v. Dean Witter Reynolds*, 537 U.S. 79, 83-84 (2002).  That is a determination that is "more limited in scope." *Id.*  Essentially, the Court's function is to assess two major issues: (i) whether the parties contractually agreed to arbitrate disputes and (ii) whether the arbitration clause in a binding contract applies to the particular type of controversy. *See id.* at 84.  Any other of the myriad questions raised by the Plaintiffs – whether Goldgroup waived its right to proceed outside of a Mexican forum, whether it should be judicially estopped, etc. – are questions for the arbitrator. *Id.* at 84-85 (indicating that defenses of waiver, estoppel, etc. are issues for determination by the arbitrator).

---

[6]     Although *AT&T Technologies* addresses these longstanding principles in the particular context of labor relations – where the notion of alternative dispute resolution via arbitration first gained traction – these same principles are applied to arbitration in all areas of the law. *See e.g. BG Group PLC v. Republic of Argentina*, 134 S.Ct. 1198, 1206-07 (2014) (citing same principles in context of international commercial arbitration).

In order to fulfill its narrow duty to determine the threshold question of arbitrability, the Court turns solely to the Option Agreement (to determine whether an agreement to arbitrate exists) and Goldgroup's Demand for Arbitration (to determine whether the claims fall within the agreement to arbitrate). The first question is easily answered: the Option Agreement, to which Dyna Mexico, Dyna USA, and Goldgroup are all named parties, contains an express provision stating that "All questions or matters in dispute under this Agreement shall be submitted first to mediation and then if no resolution to binding arbitration." Thus, there can be no dispute that the parties have agreed to arbitrate disputes arising under the Option Agreement.

The more contested question is whether Goldgroup's issues arise under the Option Agreement. To determine this question, the Court must first examine Goldgroup's Amended Demand for Arbitration, which raises claims of, among other things, breach of contract and breach of fiduciary duty. The Court finds that at least some of the allegations therein derive from obligations assumed by Dyna Mexico in the Option Agreement in two major respects. First, The Amended Demand for Arbitration contends that "Article 7.9 of the Agreement establishes a Management Committee to oversee expenditures." This is correct: Article 7.9 of the Option Agreement provides that "the Management Committee shall oversee the Expenditures[7] and shall be comprised of 3 persons . . . two designated by Goldgroup" and that "All Expenditures shall be expended in accordance with a budget approved by the Management Committee prior to such expenditure." Nevertheless, the Amended Demand for Arbitration alleges that "Dyna USA incurred substantial expenses purportedly in connection with operation of Dyna Mexico" but that "[n]one of these expenses were submitted to or approved by the Management Committee."

---

[7]     The Option Agreement defines "Expenditures" as "the sum of all costs of maintenance and operation of [a particular property and project], all expenditures on the exploration and development of [that project], and all other costs and expenses of whatsoever kind or nature . . . incurred or chargeable with respect to the exploration of [the project]."

Construing the Demand in the light most favorable to Goldgroup, this allegation is one that the Plaintiffs allowed Dyna USA to make "Expenditures" that were not approved by the Management Committee, ostensibly violating Article 7.9 of the Option Agrement.

Second, Article 7.3 of the Option Agreement allows Goldgroup to name two of the four members to Dyna Mexico's Board of Directors and states that the four Directors would jointly choose a fifth.  Although Dyna Mexico did permit Goldgroup to name two Directors, the Amended Demand for Arbitration implicitly alleges that no fifth Director was ever appointed, which itself could be said to be a breach of the terms of the Option Agreement.  Moreover, the Demand alleges that Dyna Mexico purposefully avoided appointing the fifth member to ensure that tie votes among the four Directors would grant Dyna Mexico's President the power to act solely in Dyna Mexico's interests, and that Dyna Mexico acted in various ways to evade intervention by the Board of Directors, such as refusing to convene plenary Board meetings and instead calling sham meetings where only the Dyna Mexico-appointed Directors are present. These allegations suggest that although Dyna Mexico may have facially complied with the requirement to grant Goldgroup seats on the Board, Dyna Mexico breached the contract (or its fiduciary duties towards Goldgroup) by operating in such a way as to deprive Goldgroup of the benefits of equal representation in the management decisions of Dyna Mexico which was a clear intent of the Option Agreement.

Thus, it is apparent to the Court that Goldgroup's Amended Demand for Arbitration expressly invokes provisions of the Option Agreement and that at least some of its claims are, at least facially, based on alleged breaches of the terms of that Agreement.  Although the Plaintiffs assert a litany of arguments as to why arbitration should not proceed – the Option Agreement expired by its terms, Goldgroup has waived the ability to invoke arbitration in the U.S. by

agreeing to Dyna Mexico's Bylaws,[8] Mexican courts are already hearing the same matters, Goldgroup should be judicially estopped from raising these claims, the claims are meritless, etc. -- nearly all of these are matters that are outside the narrow scope of this Court's threshold arbitrability determination and are more properly addressed to the arbitrator.   The Court need only consider the Plaintiffs' contention that the "expiration" of the Option Agreement operated to extinguish any agreement by the parties to arbitrate; after all, if the Agreement has unambiguously expired, the parties' agreement to arbitrate would no longer be valid.

The Court rejects that argument out of hand.  The Option Agreement contains no express provision setting a date by which it would terminate.  Moreover, although certain obligations of the parties under the Option Agreement could be fully completed at some point in time (*e.g.* Goldgroup completed its capital contributions according to the stated schedule and Dyna Mexico completed its obligation of allowing Goldgroup to appoint two Board members), the Option Agreement contains other provisions that impose obligations on the parties that seemingly continue indefinitely or which have yet to be completed.  For example, nothing in Article 7.9 of the Option Agreement suggests that the Management Committee's oversight over expenditures would expire at any point in time, and thus, the Option Agreement remains in force and effect as to that matter.  Similarly, Article 7.3 calls for the selection of a fifth Director, an event which Goldgroup alleges has yet to occur.  Once again, at least as it relates to that provision, the Option Agreement has yet to be completed.  Thus, the Court finds that the Option Agreement remains in effect in some respects, and thus, the parties' agreement to arbitrate disputes arising under that Agreement remain operative as well.

---

[8]     The Court notes that, notwithstanding Dyna Mexico's insistence in its bylaws that all disputes be resolved in Mexico, it voluntarily entered into the Option Agreement calling for disputes thereunder to be resolved in the United States.

Accordingly, because the Court finds that some of the issues in Goldgroup's Amended Demand for Arbitration are indeed arbitrable under the terms of the Option Agreement, the Court denies the Plaintiffs' Motion for Summary Judgment. Although the court does not go so far as to instead direct summary judgment in favor of Goldgroup, *see* Fed. R. Civ. P. 56(f), the effect of the findings in this Order would seem to be fatal to the Plaintiffs' continued maintenance of this suit. Accordingly, within 21 days of this Order, the Plaintiffs shall show cause why, based on the findings herein, the Court should not grant judgment in favor of Goldgroup on all claims.

## CONCLUSION

For the foregoing reasons, the Court **SUSTAINS** the Plaintiffs' Objections **(# 37)** and **DECLINES** to adopt the Recommendation **(# 36)**. Goldgroup's Motion to Dismiss **(# 23)** is **DENIED**. The Plaintiffs' Motion for Summary Judgment **(# 29)** is **DENIED**, and the Plaintiffs shall show cause within 21 days of this Order why judgment in favor of Goldgroup should not be granted.

Dated this 29th day of September, 2015.

**BY THE COURT:**

Marcia S. Krieger
Chief United States District Judge